**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| *ex rel.* **JAMES JOHN HUGHES,** | ) | **FILED UNDER SEAL** |
| | ) | |
| **Relator,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-544-R** |
| | ) | |
| **PAE APPLIED TECHNOLOGIES LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**Preliminary Statement**

This Amended Complaint is based upon a scheme conducted by the Defendant, PAE Applied Technologies LLC, to defraud the United States of America through the submission of false and fraudulent claims to the United States Air Force, and false statements and records in support of such claims, for wage increases requested on behalf of—but not paid to—its employees, pursuant to a service contract. The contract concerned aircraft maintenance and base operations at Vance Air Force Base, in Enid, Oklahoma. The fraudulent scheme and the submission of the claims occurred at PAE's offices located at Fort Worth, Texas.

The Relator, James Hughes, through his undersigned counsel, acting on behalf of and in the name of the United States, brings this civil action under the *qui tam* provisions of the False Claims Act; and hereby alleges the following:

## I. BACKGROUND

### Jurisdiction and Venue

1.      This Court has original jurisdiction over this Amended Complaint (the "Complaint") pursuant to the federal False Claims Act, 31 U.S.C. § 3732(a), and 28 U.S.C. § 1345.

2.      Many of the alleged acts occurred in the Western District of Oklahoma; and the Defendant transacted business in Enid, in the Western District of Oklahoma, as it performed the contract that is the subject of this lawsuit, on Vance Air Force Base, in Enid, Oklahoma.  For these reasons, venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

### The Relator

3.      Plaintiff James John Hughes ("James Hughes" or "Mr. Hughes") is a citizen of the United States and a resident of Arlington, Texas; he is bringing this suit for himself and in the name of, and on behalf of, the United States of America.

4.      Mr. Hughes has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based, derived through his employment with Defendant PAE Applied Technologies LLC as a Cost Volume Manager; and he provided the information upon which he bases his allegations in this Complaint to the United States before filing this Complaint.

5.      None of the allegations set forth in this Complaint is based upon a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or in the news media.

**The Defendant**

6.     Defendant PAE Applied Technologies LLC ("PAE") is a Delaware corporation with its principal offices located at 6500 West Freeway, Suite 600, Fort Worth, Texas.  Among its various businesses is that of a defense contractor, providing services to the U.S. military.

7.     PAE is a subsidiary of Pacific Architects and Engineers, Inc., which is incorporated in the State of California and which has headquarters in both Los Angeles, California and Arlington, Virginia.

8.     Prior to 2013, PAE was a division within the Computer Sciences Corporation ("CSC"), and was known as the Applied Technologies Division ("AT Division").  In 2013, Pacific Architects and Engineers, Inc. acquired the AT Division and made it part of PAE.

9.     At all times pertinent to this Complaint, the officers and managers of PAE included the following:

(a)     John Felt: Deputy Program Director;

(b)     John Harris:  Program Director, from January 2013 until the filing of this Complaint;

(c)     Stephanie Jeffers: Financial Professional who prepared invoices for many of PAE's government contracts;

(d)     Paul Keck: Business Manager and Contract Administrator, who was onsite for PAE at Vance Air Force Base in Enid, Oklahoma

(e)     Chris Knowles: Program Manager, from about June 2012 through about December 2012;

(f)     Daniel B. Metzger: Contracts Manager;

(g)    Danny Ohnesorge: Program Manager, from about April 2008 through about 2010;

(h)    Terrie Paschall: Senior Pricing Manager;

(i)    Gary Richardson: Program Manager, from about 2010 through about June 2012; and

(j)    Lori Woolsey: payroll and accounting.

## The Vance Contract

10.    The Air Education and Training Command ("AETC") is one of ten major commands of the United States Air Force ("USAF" or the "Air Force").   It reports to Headquarters of the USAF.

11.    The 71st Flying Training Wing of the USAF (the "71st Flying Wing") has as its mission the training and development of U.S. and Allied pilots for deployment in combat.

12.    The 71st Flying Wing reports to the AETC and is based at Vance Air Force Base ("Vance AFB"), located in Enid, Oklahoma.

13.    In or about 2000, the AETC awarded to Dyncorp International a service contract for base operations and support at Vance AFB.   CSC acquired Dyncorp International in 2003, and the contract was performed on behalf of CSC by its AT Division.

14.    In 2006, the AETC issued a Request for Proposal for a follow-on service contract for base operations at Vance AFB.   The contract was known formally as the "Aircraft Maintenance, Airfield Management, Aircrew Life Support and Base Operating Support (BOS) Contract for the 71 Flying Training Wing (FTW) at Vance Air Force Base (AFB), Oklahoma," and informally (within PAE) as the "Vance Contract."   Among the companies that bid on the Vance Contract was CSC, through its AT Division.

15.    The AETC Request for Proposal included the following limitation regarding available funding:

> Although full funding is not currently available for this project, this solicitation is issued in good faith and funding is anticipated. The Government's obligation under this contract is, however, contingent upon the availability of appropriated funds from which payment for contract purposes can be made . . . .
>
> * * * * *
>
> The contract resulting from this solicitation is subject to incremental funding. Your attention is drawn to Section I Clause 252.232-7000.

16.    In 2008, the AETC awarded the Vance Contract to the AT Division of CSC, with contract number FA3002-08-C-0007. (Exhibit 1.)

17.    The Vance Contract was a definitive contract, and changes were made to it in 2009 to add an award fee.

18.    The Vance Contract was subject to the requirements of the Service Contract Act ("SCA"), 41 U.S.C. § 351 *et seq*., and required that the contractor pay fair hourly wages and provide fringe benefits to its employees.

19.    The Vance Contract also included a wage "pass through" provision, whereby wages paid to the contractor's service employees were to be charged to and paid by the Air Force in accordance with the Federal Acquisition Regulation (the "FAR"), specifically Subsection (d) of FAR 52.222-43 ("Federal Labor Standards Act and Service Contract Act – Price Adjustment (Multiple Year and Option Contracts)").

20.    At all times pertinent to this Complaint, the Vance Contract and its contractor were subject to the applicable Collective Bargaining Agreement ("CBA") then in effect between the contractor and the service employees' union, this being the International Association of

Machinists and Aerospace Workers, AFL-CIO, District Lodge 171 and its Local Lodge 898 (the "Vance CBAs").

21.     Attached to this Complaint as the following Exhibits are excerpts (Article 23, "Wages") from the following Vance CBAs, with the effective dates of these CBAs:

(a) Exhibit 2: June 12, 2006, through June 7, 2009;

(b) Exhibit 3: June 23, 2009, through June 10, 2012; and

(c) Exhibit 4: June 11, 2012, through June 7, 2015.

22.     The Vance CBAs required that, in addition to annual wage increases, the contractor pay longevity pay to its service employees, which longevity pay was to be calculated for each employee as follows (emphasis added):

> 23.6 Employees will **advance toward the maximum** of the rate range of his/her job classification as follows: fifty cents ($.50) per hour (twenty-five cents ($.25) per hour for part-time employees) increase on their anniversary hire date/longevity date and annually thereafter. Progression increases will become effective at the beginning of the next payroll period. Progression (Longevity) dates for employees hired prior to February 1, 2001 will be established by the "Document" provided by the Union.

23.     The Vance CBAs included the maximum of the rate range for employees' job classifications and labor grades.

24.     When in 2013 Pacific Architects and Engineers, Inc. acquired the AT Division of CSC and made it part of  PAE, the Vance Contract stayed with the AT Division, and PAE became the contractor.

## II. THE FALSE WAGE COST PROJECTIONS

### A. The Options and the Price Determinations

25.   The Vance Contract was structured as follows: (a) with one six-month base period during the Government Fiscal Year ("fiscal year" or "GFY") for 2008; and thereafter (b) with six options, for 2009 through 2014, each lasting one fiscal year.

26.   Although the Vance Contract was awarded in 2008, the costs for wage adjustments to be paid by the Air Force for each option during each fiscal year (or each "option year") were negotiated separately, and were contingent upon whether or not the Air Force exercised the option for each such year.

27.   The Air Force executed all six options for the Vance Contract; however, the final price for option years 2010 through 2013 were not negotiated and finalized until February 2014; and the final price for option year 2014 was not negotiated until May 2014 and was not finalized until September 2014.  All such dates were after all options had commenced and after the options for fiscal years 2010 through 2013 had been completed.

28.   The final price for each option was not based upon actual costs, but was instead based upon projected costs, notwithstanding the fact that the options for years 2010 through 2013 had been completed at the time the final negotiations occurred and the prices for these options were finalized.

29.   During the periods when the Air Force executed an option and PAE performed the option, and before that option was negotiated and finalized, the Air Force made interim payments to PAE of a portion of the estimated costs of the option.

## B. The Price Proposals by Options and Fiscal Years

30.   Discussions and negotiations between the AETC and PAE regarding the prices of option years 2010 through 2013 took place at various times, up to and including February 2014.

31.   As part of PAE's preparation for these negotiations, PAE prepared spreadsheets and workbooks to support its price proposals, itemizing various anticipated costs for each option, including the pay for its employees assigned to the Vance Contract.

32.   Among the costs for pay considered for the final price for each option was the longevity pay due to each employee for that option year.

33.   Each proposal for pricing for a fiscal year included projected costs for the option year of that proposal (the "base option year"), plus those for all follow-on option years, as follows:

(a)   the spreadsheets and workbooks for the GFY 2009 proposal included pricing proposals for GFYs 2009 through 2014;

(b)   the spreadsheets and workbooks for the GFY 2010 proposal included pricing proposals for GFYs 2010 through 2014;

(c)   the spreadsheets and workbooks for the GFY 2011 proposal included pricing proposals for GFYs 2011 through 2014;

(d)   the spreadsheets and workbooks for the GFY 2012 proposal included pricing proposals for GFYs 2012 through 2014;

(e)   the spreadsheets and workbooks for the GFY 2013 proposal included pricing proposals for GFY 2013 and 2014; and

(f)   the spreadsheets and workbooks for the GFY 2014 proposal included pricing proposals for GFY 2014.

34.   When preparing these proposals, PAE was obliged to follow FAR § 52.222-43, including the clause that requires contractors to agree and represent that they have excluded from their proposed pricing any annual wage increases or escalations for non-exempt employees.   The exact language of the clause of imposing this requirement is as follows:

> (a) This clause applies to both contracts subject to area prevailing wage determinations and contracts subject to collective bargaining agreements.

> (b) The Contractor warrants that the prices in this contract do not include any allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

35.   So as to comply with the restriction imposed by this provision, all of the proposals that PAE prepared, for all fiscal years, included, for each follow-on option year, wage-rates that were identical to the wage-rates for the proposal year; that is, all of the proposals ignored that increases would be required or paid in future years.   For this reason, and starting with fiscal year 2010 as a hypothetical example:

(a)    if employees were entitled (for any reason) to a ten-cent per hour increase in pay during GFY 2010, such ten-cent per hour increase would be included as the same, one-time increase in pay for each of the five option periods from GFY 2010 through 2014;

(b)    if employees were entitled (for any reason) to another ten-cent per hour increase in pay during GFY 2011, such ten-cent per hour increase would be included as an additional one-time increase in pay in the options for GFY 2011 through 2014;

(c)    if employees were entitled (for any reason) to yet another ten-cent per hour increase in pay during GFY 2012, such ten-cent per hour increase would be included as yet another additional one-time increase in the options for GFY 2012 through 2014;

(d)   if employees were entitled (for any reason) to yet another ten-cent per hour increase in pay during GFY 2013, such ten-cent per hour increase would be included as yet another additional one-time increase in the options for GFY 2013 through 2014; and

(e)   if employees were entitled (for any reason) to yet another ten-cent per hour increase in pay during GFY 2014, such ten-cent per hour increase would be included as yet another additional one-time increase in the option for GFY 2014.

36.   As a result of the aforesaid method of constructing proposals and including wage increases, an inflated wage increase or adjustment, made in a proposal for any one year, had the effect of increasing not only the proposal's cost for that one year, but also had the effect of a cumulative, yearly-on-top-of-yearly increase in costs for each of the future option years; and, thus, in a cumulatively inflating amount throughout the life of the Vance Contract.

37.   As part of PAE's preparation for these negotiations, PAE prepared spreadsheets and workbooks to support its price proposals, itemizing various anticipated costs for each option, including the pay for its employees assigned to the Vance Contract.

38.   The proposals submitted by PAE, for year and option, by dates submitted and conclusion of negotiations, are as follows:

**TABLE A**
**(Proposals and Revisions)**

| Proposal Year | Option Years Included | Version | Submitted to AETC | Negotiation Concluded |
|---|---|---|---|---|
| GFY 2009 | 2009-14 | Initial | 10/29/08 | UNKOWN |
| " | 2010-14 | Revision 1 | 1/26/09 | — |
| " | " | Revision 2 | 3/19/09 | — |
| ": | " | Revision 3 | 8/26/09 | — |
| " | " | Revision 4 | 3/4/09 | — |
| " | " | Revision 5 | 4/9/10 | — |
| " | " | Revision 6 | 5/18/10 | — |
| " | " | Revision 7 | 11/12/10 | — |
| " | " | Corrected Rev. 7 | 1/26/11 | 5/10/12 |
| GFY 2010 | 2010-14 | ROM | 10/29/10 | — |
| " | " | Initial | 5/30/11 | — |
| " | " | Revision 1 | 12/9/11 | — |
| " | " | Revision 2 | 6/29/12 | — |
| " | " | Rev. 3 (rescinded) | 11/1/12 | — |
| " | " | Rev. 2 Updated | 2/4/13 | 2/12/14 |
| GFY 2011 | 2011-14 | Initial | 12/1/11 | — |
| " | " | Revision 1 | 8/13/12 | — |
| " | " | Revision 1 | 7/13/13 | 2/12/14 |
| GFY 2012 | 2012-14 | Initial | 2/3/12 | 2/12/14 |
| GFY 2013 | 2013-14 | Initial | 3/29/13 | 2/12/14 |
| GFY 2014 | 2014 | Initial | 5/16/14 | 9/19/14 |

**C. The General Scheme: Overstatements for Longevity Pay in Fiscal Year Proposals**

39.    At all times pertinent to this Complaint, PAE engaged in a scheme and artifice to inflate its wage costs for its proposals for options years 2009 through 2013; and to overcharge the AETC for its wage costs for option years 2010 through 2014 once these options were negotiated, finalized, executed, and billed.

11

40.    The essence of PAE's scheme and artifice was the following:

(a)    when preparing its pricing proposals for the AETC, PAE included the yearly longevity wage increases required by the applicable CBAs for each year, for each employee, in order to calculate its supposed costs for the wages of its employees and to pass-through those costs to the AETC;

(b)    when preparing these pricing proposals, PAE ignored the maximum rates, or wage-rate "caps," included in the CBAs for each employee; and

(c)    by the aforesaid means, PAE induced the AETC to agree to, and pay, wage rates in excess of those required by the CBAs for PAE's employees, while keeping the resulting excess wages and not paying, and never intending to pay, such excess wages to its employees.

41.    PAE's inflated wage costs consisted of three elements:

(a)    base costs, attributable to the base wages, that is, the straight wage per hour supposedly paid to an employee for a normal work day and work week;

(b)    supplemental costs, attributable to employee taxes, or Federal Insurance Contribution Act ("FICA") taxes, calculated by reference to an employee's base wage costs; and

(c)    further supplemental costs, attributable to workers compensation insurance ("WCI"), calculated by reference to an employee's base wage costs.

42.    PAE's inflated wage costs, resulting from its overstated longevity wage-rate increases for its employees, were included employee-by-employee, and year-by-year, in the spreadsheets and workbooks that it prepared as part of its proposals for GFY 2009 through GFY 2013; and PAE submitted these spreadsheets and workbooks to the AETC during price negotiations in support of its false and fraudulently inflated proposals and billings.

43.    The employees for whom PAE overstated longevity wage-rate increases (and to whom it did not pay these increases to the extent overstated) comprise three categories:

(a)    **Category One Employees:** those employees who were not eligible for the full amount of the longevity wage-rate increases because the full increase would place them over the wage-rate cap for their job descriptions;

(b)    **Category Two Employees:** those employees who were not eligible for longevity wage-rate increases because their wage-rates were already at the wage-rate cap for their job descriptions; and

(c)    **Category Three Employees:** those employees who were not eligible for longevity wage-rate increases because PAE was (voluntarily) already paying them wage-rates above the wage-rate cap for their job descriptions.

44.    With regard to the third category of employees, the costs for wages paid that were above an employee's specified CBA wage-rate cap were not passed-on to the AETC, except for that portion resulting from a longevity wage-rate increase included in a proposal.

### D. The 2009 Proposal: Overcharges in the Spreadsheets

45.    As part of its proposal for GFY 2009, PAE prepared and submitted to the AETC a detailed Excel workbook with multiple spreadsheets ("Tabs") within the workbook.   The projections for labor costs to be incurred, including longevity wage-rate and pay increases, for fiscal year 2009 were correct in this proposal; however, such costs for option years 2010 and beyond were not.

46.    The third spreadsheet in this proposal is captioned "GFY10 Opt Yr 2 Wages," and it contains PAE's supposed projected wages, wage increases, benefits and costs for its employees

13

assigned to the Vance Contract for fiscal year 2010. (Hereinafter, this third spreadsheet is referred to as the "Proposal 2009 Option 2 Spreadsheet.")[1]

47.   The Proposal 2009 Option 2 Spreadsheet includes data for 661 employees, identifying each by name and by an employee number. Employees are also referenced by the order in which they are listed in this spreadsheet (the "Reference Number"), ranging from one to 661.

### 1. Category One Employees

48.   Attached to this Complaint as Exhibit 5 are the following Tables for Category One Employees:

(a)   Table 1A, containing selected data taken from the Proposal 2009 Option 2 Spreadsheet for twenty-three employees, Reference Numbers 320 through 342 (columns 1-15);

(b)   Table 1B, containing additional selected data for the same employees, plus entries demonstrating overstated projected costs reported to AETC for specified labor cost (columns 16-24, and repeating columns 1-3, and 12-14); and

(c)   Table 1C, containing entries demonstrating the total overcharges to the AETC (columns 15, 25 and 26, and repeating columns 1-3, 15, 18, 20, 22, and 24).

49.   Employee David Thigpen ("Mr. Thigpen") is assigned Reference Number 342 (column 1) and is employee number 00643140 (column 2). Among the entries for Mr. Thigpen in Table 1 are the following:

(a)   Labor Category is U69-Lead, Flight (column 4);

---

[1] Proposal 2009 Option 2 Spreadsheet as drafted and submitted to the AETC contains an error in the column labeled "Subtotal Wages Adj." The entries in this column are between zero and about $3,500. The error for each entry in this column is between zero and 8.1 cents. The allegations in this Complaint, and the entries in its attached tables, do not correct for this error. For this reason, very small scale discrepancies in entries will sometime appear in the tables set out in this complaint and in the tables that comprise its exhibits.

(b)     Wage Grade for the applicable Collective Bargaining Agreement is 11 (column 5);

(c)     Anniversary Date for longevity rate increases under the CBA is Dec. 15, 1999 (column 10);

(d)     Maximum Wage-rate under the CBA is $25.52 (column 6);

(e)     Actual wage-rate for fiscal year 2008-09 is $24.23 (column 8); and

(f)     Actual wage-rate for fiscal year 2009-10 is $25.08 (column 7).

50.     As of December 15, 2009, pursuant to the Vance Contract and the CBA then in effect, PAE was obligated to pay Mr. Thigpen a longevity wage-rate increase of fifty cents per hour (column 16), *provided* that his resulting wage did not exceed the wage-rate cap under that CBA; if the resulting wage-rate exceeded this cap, then PAE was only obligated to pay Mr. Thigpen the wage-rate cap.

51.     As Mr. Thigpen's wage-rate at the commencement of fiscal year 2009 was $25.08 (column 7), adding the full fifty cents per hour longevity increase results in a wage-rate of $25.58, which exceeds the wage-rate cap for Mr. Thigpen for fiscal year 2009 of $25.52 (column 6) by six cents.

52.     The true, accurate, and correct projection for Mr. Thigpen's fiscal year 2010 wage-rate was $25.08 per hour for the period before his anniversary date of December 15 (column 7); and $25.52 per hour for the period after this date (column 6)—this being an increase of 44 cents per hour (column 17); and these were the wage-rates that PAE paid to Mr. Thigpen during those respective time periods.

53.     The number of hours that PAE projected Mr. Thigpen to work after his wage-rate was increased, that is, after his anniversary date of December 15, was 1,664 (column 11).

15

54.   PAE falsely and fraudulently reported the projected cost for Mr. Thigpen's base pay longevity rate increase as being $832 (column 12), by ignoring the wage-rate cap, and basing the cost projection for his wages upon an excessive and falsely-projected wage-rate longevity increase of the full 50 cents per hour; whereas in truth and fact, as PAE then well knew, the true, accurate, and correct projection was $732.16 (column 19), resulting in an overstatement in the amount of $99.84 (column 20).

55.   By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for Mr. Thigpen's fiscal year 2010 increases as follows:

(a)   the FICA increase as $199.83 (column 13), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the FICA increase was $192.19 (column 21), resulting in an overstatement of the increase of $7.64 (column 22); and

(b)   the Workers' Compensation Insurance ("WCI") increase as $66.61 (column 14), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the WCI increase was $64.06 (column 23), resulting in an overstatement of the increase of $2.55 (column 24).

56.   By means of the same scheme, PAE further falsely and fraudulently reported the projected full cost for Mr. Thigpen's fiscal year 2010 increases, totaling the base, FICA, and WCI increases, as $2,878.58 (column 15), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the full cost for Mr. Thigpen's longevity increase was $2,768.56 (column 25), resulting in an overstatement in the amount of $110.02 (column 26).

57.   By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for fiscal year 2010 increases for each of the remaining twenty-two employees identified in Tables 1A, 1B, and 1C (columns 1-3) as follows:

(a)     PAE claimed the base pay longevity rate increases identified in column 12, whereas in truth and fact, as PAE then well knew, the true, accurate, and correct projections for such increases were those identified in column 19, resulting in overstated amounts identified in column 20;

(b)     PAE claimed the FICA amounts identified in column 13, whereas in truth and fact, as PAE then well knew, the true, accurate and correct projections for the FICA increases were as identified in column 21, resulting in overstated increases identified in column 22;

(c)     PAE claimed the Workers' Compensation Insurance ("WCI") increases identified in column 14, whereas in truth and fact, as PAE then well knew, the true, accurate and correct projections for WCI increases were as identified in column 23, resulting in overstated increases identified in column 24; and

(d)     PAE claimed the projected full costs, totaling the base, FICA, and WCI increases, identified in column 15, whereas in truth and fact as PAE then well knew, the true, accurate and correct projections for the full costs were identified in column 25, resulting in overstated amounts identified in column 26.

## 2. Category Two Employees

58.     Attached to this Complaint as Exhibit 6 are the following Tables for Category Two Employees:

(a)     <u>Table 2A</u>, containing selected data taken from the Proposal 2009 Option 2 Spreadsheet for 303 employees, Reference Numbers 17 through 319 (columns 1-15);

(b)     <u>Table 2B</u>, containing additional selected data for the same employees, plus entries demonstrating overstated projected costs reported to AETC for specified labor cost (columns 16-24, and repeating columns 1-3, and 12-14); and

(c)    Table 2C, containing entries demonstrating the total overcharges to the AETC (columns 15, 25 and 26, and repeating columns 1-3, 15, 18, 20, 22, 23).

59.    Employee Clinton Biediger ("Mr. Biediger") has Reference Number 17 (column 1) and is employee number 00643882 (column 2).  Among the entries for Mr. Biediger in Table 1 are the following:

(a)    Labor Category is U69-Controller, Equip. & Spec. (column 4);

(b)    Wage Grade for the applicable Collective Bargaining Agreement: 10 (column 5);

(c)    Anniversary Date for longevity rate increases under the CBA: March 23, 1998 (column 10);

(d)    Maximum Wage-rate under the CBA: $24.56 (column 6);

(e)    Actual wage-rate for fiscal year 2008-09: $23.73 (column 8); and

(f)    Actual wage-rate for fiscal year 2009-10: $24.56 (column 7).

60.    As of March 23, 2009, pursuant to the Vance Contract and the CBA then in effect, PAE was obligated to pay Mr. Biediger a longevity wage-rate increase of fifty cents per hour (column 16), *provided* that his resulting wage did not exceed the wage-rate cap under that CBA; if the resulting wage-rate exceeded this cap, then PAE was only obligated to pay Mr. Biediger up to the wage-rate cap.

61.    As Mr. Biedeger's wage-rate at the commencement of fiscal year 2010 was $24.56 (column 7), adding the full fifty cents per hour longevity increase results in a wage-rate of $25.06, which exceeds the wage-rate cap for Mr. Biedeger for fiscal year 2010 of $24.56 (column 6) by fifty cents.

62.   The true, accurate, and correct projection for Mr. Biediger's fiscal year 2010 wage-rate was $24.56 per hour for the period before his anniversary date of March 23 (column 7); and $24.56 per hour for the period after this date (column 6)—this being an increase of zero cents per hour (column 17); and these were the wage-rates that PAE paid to Mr. Biediger during those respective time periods.

63.   The number of hours that PAE projected Mr. Biediger to work after his wage-rate was increased, that is, after his anniversary date of March 23, was 1,104 (column 11).

64.   PAE falsely and fraudulently reported the projected cost for Mr. Biediger's base pay longevity rate increase as being $552 (column 12), by ignoring the wage-rate cap, and basing the cost projection upon an excessive and false projected wage-rate longevity increase of the full 50 cents per hour; whereas in truth and fact, as PAE then well knew, the true, accurate, and correct projection was $0.00 (column 19), resulting in an overstatement in the amount of $552 (column 20).

65.   By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for Mr. Biediger's fiscal year 2010 increases as follows:

(a)   the FICA increase as $42.23 (column 13), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the FICA increase was $0.00 (column 21), resulting in an overstatement of the increase of $42.23 (column 22); and

(b)   the Workers' Compensation Insurance ("WCI") increase as $14.08 (column 14), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the WCI increase was $0.00 (column 23), resulting in an overstatement of the increase of $14.08 (column 24).

66.    By means of the same scheme, PAE further falsely and fraudulently reported the projected full cost for Mr. Biediger's fiscal year 2010 increases, totaling the base, FICA, and WCI increases, $608.33 (column 15), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the full cost for Mr. Biediger's longevity increase was $0.03[2] (column 25), resulting in an overstatement in the amount of $608.30 (column 26).

67.    By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for fiscal year 2010 increases for each of the remaining 302 employees identified in Tables 2A, 2B, and 2C (columns 1-3) as follows:

(a)    the base pay longevity rate increases identified in column 12, whereas in truth and fact, as PAE then well knew, the true, accurate, and correct increases were those identified in column 19, resulting in overstated amounts identified in column 20;

(b)    the FICA amounts identified in column 13, whereas in truth and fact, as PAE then well knew, the true, accurate and correct projection for the FICA increases were as identified in column 21, resulting in overstated increases identified in column 22;

(c)    the Workers' Compensation Insurance ("WCI") increases identified in column 14, whereas in truth and fact as PAE then well knew, the true, accurate and correct WCI increases were as identified in column 23, resulting in overstated increases identified in column 24; and

(d)    the projected full costs, totaling the base, FICA, and WCI increases, identified in column 15, whereas in truth and fact as PAE then well knew, the true, accurate and correct projections for the full costs were identified in column 25, resulting in overstated amounts identified in column 26.

---

[2] This three-cent discrepancy is due entirely to the error referenced in footnote 1, *supra*. Correcting for this error, the full cost for Mr. Biediger's longevity increase was $0.00.

### 3. Category Three Employees

68.    Attached to this Complaint as Exhibit 7 are the following Tables for Category Three Employees:

(a)    <u>Table 3A</u>, containing selected data taken from the Proposal 2009 Option 2 spreadsheet for 9 employees, Reference Numbers 1, 3, and 10 through 16 (columns 1-15);

(b)    <u>Table 3B</u>, containing additional selected data for the same employees, plus entries demonstrating overstated projected costs reported to AETC for specified labor cost (columns 16-24, and repeating columns 1-3, and 12-14); and

(c)    <u>Table 3C</u>, containing entries demonstrating the total overcharges to the AETC (columns 15, 25 and 26, and repeating columns 1-3, 15, 18, 20, 22, 23).

69.    Employee Robert Hammons ("Mr. Hammons") has Reference Number 1 (column 1) and is employee number 00640192 (column 2).  Among the entries for Mr. Hammons in <u>Table 1</u> are the following:

(a)    Labor Category is U69-Lead, Computer (column 4);

(b)    Wage Grade for the applicable Collective Bargaining Agreement: 13 (column 5);

(c)    Anniversary date for longevity rate increases under the CBA: February 26, 2001 (column 10);

(d)    Maximum Wage-rate under the CBA: $30.73 (column 6);

(e)    Actual wage-rate for fiscal year 2008-09: $39.85 (column 8); and

(f)    Actual wage-rate for fiscal year 2009-10: $41.24 (column 7).

70.    As of February 26, 2009, pursuant to the Vance Contract and the CBA then in effect, PAE was obligated to pay Mr. Hammons a longevity wage-rate increase of fifty-cents per hour (column 16), *provided* that his resulting wage did not exceed the wage-rate cap under that

21

CBA; as his initial, actual wage-rate (column 7) exceeded this cap, PAE was not obligated to pay Mr. Hammons any longevity wage-rate increase.

71.    As Mr. Hammons' wage-rate at the commencement of fiscal year 2010 was $24.56 (column 7), adding the full fifty cents per hour longevity increase results in a wage-rate of $25.06, which exceeds the wage-rate cap for Mr. Hammons for fiscal year 2010 of $24.56 (column 6) by fifty cents.

72.    The true, accurate, and correct projection for Mr. Hammons' fiscal year 2010 wage-rate was $41.24 per hour for the period before his anniversary date of February 26 (column 7); and $41.24 per hour for the period after this date) (column 7)—this being an increase of zero cents per hour (column 17); and these were the wage-rates that PAE paid to Mr. Hammons during those respective time periods.

73.    The number of hours that PAE projected Mr. Hammons to work after his wage-rate was increased, that is, after his anniversary date of February 26, was 1,240 (column 11).

74.    PAE falsely and fraudulently reported the projected cost for Mr. Hammons' base pay longevity rate increase as being $620 (column 12), by ignoring the wage-rate cap, and basing the cost projection upon an excessive and false projected wage-rate longevity increase of the full 50 cents per hour; whereas in truth and fact, as PAE then well knew, the true, accurate, and correct projection was $0.00 (column 19), resulting in an overstatement in the amount of $620 (column 20).

75.    By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for Mr. Hammons' fiscal year 2010 increases as follows:

(a)     the FICA increase as $47.43 (column 13), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the FICA increase was $0.00 (column 21), resulting in an overstatement of the increase of $47.43 (column 22); and

(b)     the Workers' Compensation Insurance ("WCI") increase as $3.10 (column 14), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the WCI increase was $0.00 (column 23), resulting in an overstatement of the increase of $3.10 (column 24).

76.    By means of the same scheme, PAE further falsely and fraudulently reported the projected full cost for Mr. Hammons' fiscal year 2010 increases, totaling the base, FICA, and WCI increases, $670.54 (column 15), whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the full cost for Mr. Hammons' longevity increase was $0.00 (column 25), resulting in an overstatement in the amount of $670.54 (column 26).

77.    By means of the same scheme, PAE further falsely and fraudulently reported the projected cost for fiscal year 2010 increases for each of the remaining eight employees identified in Tables 3A, 3B, and 3C (columns 1-3) as follows:

(a)     the base pay longevity rate increases identified in column 12, whereas in truth and fact, as PAE then well knew, the true, accurate, and correct increases were those identified in column 19, resulting in overstated amounts identified in column 20;

(b)     the FICA amounts identified in column 13, whereas in truth and fact as PAE then well knew, the true, accurate and correct projection for the FICA increases were as identified in column 21, resulting in overstated increases identified in column 22;

(c)     the Workers' Compensation Insurance ("WCI") increases identified in column 14, whereas in truth and fact as PAE then well knew, the true, accurate and correct WCI

increases were as identified in column 23, resulting in overstated increases identified in column 24; and

      (d)   the projected full costs, totaling the base, FICA, and WCI increases, identified in column 15, whereas in truth and fact as PAE then well knew, the true, accurate and correct projections for the full costs were identified in column 25, resulting in overstated amounts identified in column 26.

### 4. Summary of Overcharges

78.   The total overcharges, by employee category and statement of costs, submitted to the AETC by PAE in its GFY 2009 final revised Proposal (Corrected Revision 7) for fiscal year 2010 (Option Year 2) and for each succeeding option year (that is, fiscal years 2011 through 2014) were as follows:

**TABLE B**
**(Overcharges: 2009 Proposal, Option Years 2010-14)**

| Employee Category: | I | II | III | Totals |
|---|---|---|---|---|
| Base Longevity | $7,495.44 | $158,132.00 | $4,456.00 | $170,083.44 |
| FICA Increase | $573.40 | $12,097.10 | $340.88 | $13,011.38 |
| WCI Increase | $190.13 | $4,703.72 | $146.21 | $5,040.05 |
| Totals: | $8,258.97 | $174,932.82 | $4,943.09 | $188,134.88 |

79.   The total overcharge submitted by PAE to the AETC in its GFY 2009 Proposal for each fiscal year beginning with 2010 and ending with 2014 was $188,134.88.

### E. The Proposals for Years 2010 through 2013

80.   By means of the same scheme, PAE further falsely and fraudulently reported additional projected cost, for the options for fiscal years 2010 through 2013, in its Proposals for the fiscal years 2010 through 2013.

### 1. Proposal for GFY 2010

81.     For its Proposal for Fiscal Year 2010 ("2010 Proposal"), PAE entered false statements of wage costs, for option year 2010, due to fraudulent longevity adjustments for 365 employees (the "affected employees").  The Reference Numbers for these employees were:

(a)     **For Category One Employees**, there were 36 affected employees, having the following Reference Numbers: 355– 390;

(b)     **For Category Two Employees**, there were 321 affected employees, having the following Reference Numbers: 9–24, 26–40, 42–54, 56, 57, 59–63, 66–83, 86–120, 122, 124–194, 197–211, 213 – 223, 225–233, 235–244, 246–256, 258–266, 268, 270–280, 282, 283, 285–289, 291 – 313, 315–336, 338–341, 343–354; and

(c)     **For Category Three Employees**, there were six affected employees, having the following Reference Numbers: 1–6.

82.     For each of the affected employees identified in PAE's 2010 Proposal, PAE made the following seven false, inflated entries: (1) longevity base pay, (2) base pay longevity rate increase, (3) FICA cost, (4) FICA cost increase, (5) WCI cost, (6) WCI cost increase, and (7) full projected cost increase attributable to a longevity rate increase.

83.     The total overcharges, by employee category and statement of costs, submitted to the AETC by PAE in its GFY 2010 final revised Proposal (Revision 2 Updated) for fiscal year 2010 (Option Year 2) and each succeeding option year (that is, fiscal years 2011 through 2014) were as follows:

**TABLE C**
**(Overcharges: 2010 Proposal, Option Years 2010-14)**

| Employee Category: | I | II | III | Totals |
|---|---|---|---|---|
| Base Longevity | $9,510.64 | $170,464.00 | $3,156.00 | $183,130.64 |
| FICA Increase | $727.56 | $13,040.50 | $241.43 | $14,009.49 |
| WCI Increase | $262.87 | $4,796.56 | $67.25 | $5,126.67 |
| Totals: | $10,501.07 | $188,301.05 | $3,464.68 | $202,266.81 |

84.    The total overcharge submitted by PAE to the AETC in its GFY 2010 Proposal for each fiscal year beginning with 2010 and ending with 2014 was $202,266.81.

## 2. Proposal for GFY 2011

85.    For its Proposal for Fiscal Year 2011 ("2011 Proposal"), PAE entered false statements of wage costs, for option year 2011, due to fraudulent longevity adjustments for 395 employees.  The Reference Numbers for these employees were:

(a)    **For Category One Employees**, there were 43 affected employees, having the following Reference Numbers: 354–396;

(b)    **For Category Two Employees**, there were 336 affected employees, having the following Reference Numbers: 22–340, 347–353; and

(c)    **For Category Three Employee**s, there were 16 affected employees, having the following Reference Numbers: 1, 4, 8–21.

86.    For each of the affected employees identified in PAE's 2010 Proposal, PAE made the following seven false, inflated entries: (1) longevity base pay, (2) base pay longevity rate increase, (3) FICA cost, (4) FICA cost increase, (5) WCI cost, (6) WCI cost increase, and (7) full projected cost increase attributable to a longevity rate increase.

87.   The total overcharges, by employee category and statement of costs, submitted to the AETC by PAE in its GFY 2011 final revised Proposal (Revision 1) for fiscal year 2011 (Option Year 3) and for each succeeding option year (that is, fiscal years 2012 through 2014) were as follows:

**TABLE D**
**(Overcharges: 2011 Proposal, Option Years 2011-14)**

| Employee Category | I | II | III | Totals |
|---|---|---|---|---|
| Base Longevity | $13,506.50 | $174,278.17 | $7,188.15 | $194,972.82 |
| FICA Increase | $1,033.25 | $13,332.28 | $549.89 | $14,915.42 |
| WCI Increase | $414.41 | $4,941.19 | $178.58 | $5,534.17 |
| Totals: | $14,954.15 | $192,551.64 | $7,916.62 | $215,422.41 |

88.   The total overcharge submitted by PAE to the AETC in its GFY 2011 Proposal for each fiscal year beginning with 2011 and ending with 2014 was $215,422.41.

### 3. Proposal for GFY 2012

89.   For its Proposal for Fiscal Year 2012 ("2012 Proposal"), PAE entered false statements of wage costs, for option year 2012, due to fraudulent longevity adjustments for 352 employees.  The Reference Numbers for these employees were:

(a)   **For Category One** Employees, there were 37 affected employees, having the following Reference Numbers: 321-357;

(b)   **For Category Two** employees, there were 309 affected employees, having the following Reference Numbers: 7–226, 228–316; and

(c)   **For Category Three** employees, there were six affected employees, having the following Reference Numbers: 1–6.

90.     For each of the affected employees identified in PAE's 2010 Proposal, PAE made the following seven false, inflated entries: (1) longevity base pay, (2) base pay longevity rate increase, (3) FICA cost, (4) FICA cost increase, (5) WCI cost, (6) WCI cost increase, and (7) full projected cost increase attributable to a longevity rate increase.

91.     The total overcharges, by employee category and statement of costs, submitted to the AETC by PAE in its GFY 2012 Proposal (Initial) for fiscal year 2012 (Option Year 4) and for each succeeding option year (that is, fiscal years 2013 and 2014) were as follows:

**TABLE E**
**(Overcharges: 2012 Proposal, Option Years 2012-14)**

| Employee Category: | I | II | III | Totals |
|---|---|---|---|---|
| Base Longevity | $12,969.04 | $169,872.00 | $2,440.00 | $185,281.04 |
| FICA Increase | $992.13 | $12,995.21 | $186.66 | $14,174.00 |
| WCI Increase | $396.20 | $4,772.87 | $80.69 | $5,249.76 |
| Totals: | $14,357.37 | $187,640.08 | $2,707.35 | $204,704.80 |

92.     The total overcharge submitted by PAE to the AETC in its GFY 2012 Proposal for each fiscal year beginning with 2012 and ending with 2014 was $204,704.80.

**4. Proposal for GFY 2013**

93.     For its Proposal for Fiscal Year 2013 ("2013 Proposal"), PAE entered false statements of wage costs, for option year 2013, due to fraudulent longevity adjustments for 290 employees.  The Reference Numbers for these employees were:

(a)     **For Category One Employees**, there were 27 affected employees, having the following Reference Numbers: 264-290;

(b) **For Category Two Employees**, there were 255 affected employees, having the following Reference Numbers: 9–263; and

(c) **For Category Three Employees**, there were eight affected employees, having the following Reference Numbers: 1–8.

94. For each of the affected employees identified in PAE's 2010 Proposal, PAE made the following seven false, inflated entries: (1) longevity base pay, (2) base pay longevity rate increase, (3) FICA cost, (4) FICA cost increase, (5) WCI cost, (6) WCI cost increase, and (7) full projected cost increase attributable to a longevity rate increase.

95. The total overcharges, by employee category and statement of costs, submitted to the AETC by PAE in its GFY 2013 Proposal (Initial) for fiscal year 2012 (Option Year 5) and for each succeeding option year (that is, fiscal year 2014) were as follows:

**TABLE F**
**(Overcharges: 2013 Proposal, Option Years 2013-14)**

| Employee Category: | I | II | III | Totals |
|---|---|---|---|---|
| Base Longevity | $7,053.12 | $137,400.00 | $3,400.00 | **$147,853.12** |
| FICA Increase | $241.43 | $10,508.96 | $260.10 | **$11,010.49** |
| WCI Increase | $67.25 | $3,722.43 | $63.93 | **$3,853.61** |
| Totals: | **$7,361.80** | **$151,631.39** | **$3,724.03** | **$162,717.21** |

96. The total overcharge submitted by PAE to the AETC in its GFY 2013 Proposal for each fiscal year beginning with 2013 and ending with 2014 was $162,717.21.

## 5. Cumulative Overcharges

97. Each year, PAE's proposal for that year stated the **increase** of wage costs projected for the next fiscal year over and above the projected wage costs for the previous year. For that

reason, the false and fraudulent overstated wage costs built up, compounding from year to year, in each proposal.

98.   The overstated costs presented by PAE's proposals in each year's proposal, for the option year during the period of that proposal, and the cumulative amount of these overstated costs, are as follows:

**TABLE G**
**(Cumulative and Total Overcharges: Rounded)**

| Proposal for Year | Longevity Adjustment | FICA & WCI Adj. | Totals |
|---|---|---|---|
| **2009** | $0 | $0 | $0 |
| **2010** | $353,214 | $37,188 | $390,402 |
| **2011** | $548,187 | $57,637 | $605,824 |
| **2012** | $733,468 | $77,061 | $810,529 |
| **2013** | $881,321 | $91,925 | $973,246 |
| **2014** | $881,321 | $91,925 | $973,246 |
| **TOTAL – ALL YEARS:** | **$3,397,511** | **$355,736** | **$3,753,247** |

## II. THE FRAUD: THE RANDOLPH AFB NEGOTIATIONS

### A. The Initial Presentations, Questions, and Answers

99.   In October 2008, PAE presented to the AETC a workbook as its initial proposal for fiscal year 2009.  Among the spreadsheets included in this workbook was "GFY 2009 Option Yr 1," projecting the wage costs and increases for Option Year One, that is, fiscal year 2009 (October 1, 2008 through September 30, 2010).  This workbook was prepared by Paul Keck, then the Business Manager and Contract Administrator for PAE for the Vance Contract, who

was based onsite at Vance Air Force Base in Enid, Oklahoma. The longevity wage cost increases presented in the spreadsheet GFY 2009 Option Yr 1 for fiscal year 2009 were correct.

100. The AETC complained that this initial proposal was too complex. In response, Terrie Paschall, PAE's Senior Pricing Manager, who was based in Fort Worth, Texas, prepared and submitted simplified proposals for fiscal years 2009 through 2013, including all the spreadsheets projecting the wage costs and increases for Option Years 2 through 5 (October 1, 2009 through September 30, 2013).

101. On or about January 15, 2013, the AETC submitted several questions, in writing, to PAE concerning its proposal for fiscal year 2009. Terrie Paschall responded to those questions. (Exhibit 8.)

102. Among the AETC's questions and PAE's answers was the following exchange:

**QUESTION:** We looked at your longevity hours, how do you calculate the longevity hours? Are they based on calendar days and are you counting the 29th and 30th of September for 8 hours each day? Please tell me where in the CBA, the specific page, that discusses the longevity calculation and its application. For example where in the CBA does it state the cost factor that applies to the longevity time? Are you counting the hire date to the end of the performance date?

**ANSWER:** The formula for calculating longevity hours is contained in each cell. The CBA requires $0.50 per hour increase to each employee's base labor rate effective on the anniversary hire date (original to site, not CSC contract). The formula automatically calculates the number of workdays between the anniversary hire date and the end of the GFY for that specific year or years. Article 23 of the CBA covers longevity, specifically 23.6, and begins on Page 52. The increase for longevity is permanent and is therefore calculated to the end of the contract.

103. In providing this answer, Terrie Paschall was deceptive and misleading, in that she omitted the material effect of the wage cap.

104. In the last sentence of this answer, Terrie Paschall confirms the cumulative nature of the increases for longevity: each proposal builds on the previous year's increases.

105.  Also among the AETC's questions and PAE's answers was the following:

**QUESTION:** We can see Emergency Leave – Relative leave on your Cost point Actuals from the Rev 2, 06-29-12 Wages, what type of hours does CSC roll up into this category hours.  Please give a full description of what CSC does with these hours.  They are not designated at [*sic*] Paid Time off.

**ANSWER:** The actuals were not used as basis for adjustment calculations in the Rev 3 proposal except for shift premium hours and overtime; however, Emergency Leave-Relative is Funeral Leave (CBA Article 11, specifically 11.11, Page 31).

106.  In the last sentence of this answer, Terrie Paschall confirms that projections, and not actual data, were used to calculate the costs of wage increases for PAE's proposals, except as specified in this answer.

107.  On or about October 28, 2013, Ms. Paschall sent to Gunoy Fortune, a Pricing Specialist working on the Vance contract negotiations for the AETC, an email. In this email Ms. Paschall said (bold added):

You also did not mention CBA longevity pay, but basically each CBA employee receives a $0.50 per hour bump in pay beginning on their anniversary hire date. The anniversary hire, or longevity, dates are maintained in the QMIS (Quality Management Information System) at Vance AFB. A report out of QMIS is also right in the cost model at the back of the workbook. The dates were copied into the cost Wages worksheet because they could not be looked up by formula. **There is a formula, though, for calculating the number of days in the year after the longevity date and then multiplying that number of days by eight hours for which the employee receives the extra $0.50 per hour.**

108.  In offering this explanation, Terrie Paschall was deceptive and misleading, in that: (i) she omitted the material effect of the wage cap; and (ii) she omitted the fact that the formula used by PAE to calculate longevity increases in its spreadsheets was defective in that it did not take into account the wage cap.

## B. Discovery of the Overstated Longevity Costs

109.  As part of the negotiation process for determining the final price for the Vance Contract, including all option years, PAE submitted its proposals for fiscal years 2009 through 2014 to the AETC in the form of workbooks and spreadsheets.

110.  As of September 23, 2013, the submission by PAE of its proposal for fiscal year 2014 had been postponed until November 29, 2013.

111.  On September 23, 2013, Terrie Paschall sent an email to James Hughes directing him to prepare PAE's proposal for fiscal year 2014, and instructing him to use one of the previous wage adjustment proposals, prepared by her, as a template (the "Paschall template").

112.  In or about mid-October 2013, while preparing PAE's proposal for fiscal year 2014, using a formula that he had developed on his own, Mr. Hughes noticed that his calculations awarded longevity pay increases to far fewer employees, and often in lesser amounts, than did the formula used in the Paschall template.

113.  Upon further examination, he observed that the Paschall template awarded the full fifty cents per hour longevity pay increase to employees while ignoring the question of whether an employee's pay rate was at or above his or her CBA rate cap.  He also realized that the resulting increase was cumulative, compounding through all of the option years.

114.  On or about November 20, 2013, Mr. Hughes and Ms. Paschall held a conversation during which he told her about his discovery of the error that he found in the longevity wage calculations, describing it as a "problem."  Mr. Hughes tried to explain how he found the problem, but Ms. Paschall was not interested.  She said that she would look into it when she had more time.

33

115.  On or about November 26, 2013, upon instructions given to him by Ms. Paschall, Paul Keck sought from the AETC a further extension of time in which to submit PAE's Proposal for fiscal year 2014, until December 31, 2013; the extension was granted.

116.  On or about December 15, 2013, Mr. Hughes and Ms. Paschall held another conversation concerning the calculations for the longevity wage-rates.  During this conversation, Mr. Hughes showed Ms. Paschall where the error existed in the pertinent spreadsheet, which she had pulled up on her computer; explained what was, and what was not, allowed by the CBA; told her that this error existed in each of the proposals for fiscal years 2010 through 2013; and told her that he had corrected the problem in the 2014 proposal that he was preparing.

117.  During this conversation, Ms. Paschall responded that PAE was not going to withdraw or correct any of the earlier proposals; that the proposals for the previous four years (2010 through 2013) had been pending with the AETC for many years; and that she, acting on behalf of PAE, would not change them voluntarily.

118.  On or about December 30, 2013, Terrie Paschall asked the AETC for yet another extension for submitting the 2014 Proposal; and AETC granted this request, extending the deadline for submission to January 31, 2014.

119.  On or about January 20, 2014, James Hughes and Terrie Paschall met.  Prior to this meeting, Mr. Hughes prepared modified versions of the PAE proposals for 2010 through 2013. These modified versions of these proposals had additional columns that demonstrated the correct longevity wage increases and the amounts that the original proposals overstated costs to the AETC.

120.  The modified proposals, which did not include corrections for FICA taxes and for WCI contributions, were approximately $200,000 less per option per year than the proposals

34

PAE had already submitted to the AETC; and the cumulative overcharges totaled about $\underline{\$2.8}$ $\underline{million}$.

121.  During this meeting, James Hughes informed Terrie Paschall about the amounts of the overcharges, and asked what he should do with the modified proposals and how he should handle the proposal for fiscal year 2014 (which he had completed but which had not yet been submitted to the AETC).  Ms. Paschall refused to submit corrected proposals for the prior years.

122.  PAE requested yet a further extension for submitting the 2014 proposal, and also requested a face-to-face meeting to negotiate and finalize all proposals for fiscal years 2010 through 2013.  The face-to-face meeting was arranged to take place on February 11th and 12th, 2014, at Randolph Air Force Base ("Randolph AFB") in Schertz, near San Antonio, Texas (the "Randolph meeting").

### C. The In Person Negotiations between PAE and AETC

123.  The Randolph meeting took place as scheduled at Randolph AFB.  PAE was represented by Terrie Paschall, James Hughes, and Daniel Metzger, PAE's Contract Manager for the Vance Contract; AETC was represented by Gloria Marshall, the Contracting Officer for the Vance Contract, and Rhonda Taylor, the Contracts Specialist for the Vance Contract.

124.  On the day before the meeting, that is, on February 10, 2014, Ms. Paschall, Mr. Hughes, and Mr. Metzger rented a car and drove from Fort Worth, Texas, to Randolph AFB.

125.  Before renting the car, Mr. Hughes gave Mr. Metzger a ride to the rental station. During this ride, Mr. Hughes made Mr. Metzger aware of the longevity rate problem with the proposals: he told Mr. Metzger about the problem he had discovered; that Ms. Paschall was fully aware of the problem; that he had had no success in convincing Ms. Paschall to correct the

proposals; and that she decided that if the subject came up during the Randolph meeting that they would address it then.

126.  The Randolph meeting started on February 11, 2014, at 9:30 a.m., and PAE relied upon its previously submitted 2009 through 2013 proposals, including all false entries in the workbooks and spreadsheets for these proposals; and proposals for 2010 through 2013 were represented to the AETC as part of the negotiations for fiscal years 2010 through 2013.  At no time did PAE correct or identify the false entries in these workbooks and spreadsheets to the AETC representatives during this meeting.

127.  During the meeting, the AETC challenged PAE's projections for entries unrelated to the longevity wage-rate increases, specifically an item referenced as "called-in hours not-worked."  PAE agreed to remove this item from its two proposals that included "called-in hours not-worked," these being fiscal year 2010 in the amount of $3,735; and 2011, in the amount of $4,098.  No reduction was discussed or agreed upon for longevity wage-rate increases.

128.  On or about April 28, 2014, Daniel Metzger forwarded to James Hughes an AETC email, from Rhonda Taylor to Mr. Metzger, confirming that the Air Force accepted the proposals as negotiated:

> Dan, I spoke with Gloria [Marshall] and she agrees with the numbers you sent over.  That is the amount we will be issuing the WPT [wage pass through] modification for to [sic] PAE, $18,371,445 for FY10, $18,658,598 for FY11, $10,614,084 for FY12, and $6,040,0180 for FY13.  Total amount for the modification:  $53,684,145.00 Thanks, Rhonda [Taylor]

129.  The amounts negotiated and agreed upon between PAE and the AETC included the cumulative overstated longevity payments contained in the workbooks and spreadsheets for PAE's proposals for fiscal years 2009 through 2013.

130.  James Hughes later completed the PAE proposal for fiscal year 2014.  The manner in which he prepared this proposal used the correct formula for the longevity wage-rate calculations.

### D. Confirmation of PAE's Knowledge and Intent

131.  On April 29, 2014, James Hughes and Terrie Paschall had a conversation during which Ms. Paschall confirmed PAE's knowledge of the false entries in the workbooks and spreadsheets of Proposals 2009 through 2013 concerning the longevity wage-rate increases, and PAE's intent to defraud the AETC during the negotiation of the final price of the Vance Contract.

132.  In part, this conversation between James Hughes (JH) and Terrie Paschall (TP) occurred as follows:

**JH:** You know what scares me about Vance.

**TP:** What? They're going to bid it again?

**JH:** No. With the shit that's sitting down in San Antonio right now, it's sitting there.

**TP:** Yeah.

**JH:** And we got 14 going in.

**TP:** Yeah, I know. I didn't even bother to extend the due date. I just didn't care.

**JH:** And the freaking mistake is still in there.

**TP:** Oh, on the CBA?

**JH:** On the longevity.

**TP:** I don't care. I couldn't care less. We gave up legitimate dollars that we were entitled to. Not to mention the fact that they dragged this shit out for years. Don't care. They didn't find it, they didn't bring it up. You did 14 correctly, right?

**JH:** I did 14 correctly.

**TP:** Then that's fine.

**JH:** But I fixed it.

**TP:** That's fine.

**JH:** I mean, I did it correctly…

**TP:** That's fine. Jim, it comes down to negotiation. Negotiation. They make mistakes. We make mistakes. We gave up dollars to which we were rightfully entitled, didn't offer dollars that we were not rightfully entitled and neither did they. We'll do it right from now on.

**JH:** I've done that. I mean, I backed it out. I made it exactly like 10 through 14, or 13, were.

**TP:** No, no, you corrected it, didn't you? For 14?

**JH:** No, I made 14 just like 10 to 13.

**TP:** No, go ahead and correct it.

**JH:** You sure?

**TP:** Yes.

**JH:** Well that's not what you told me to do.

**TP:** I don't remember. Go ahead and correct it so that it's right.

**JH:** Okay.

**TP:** That way everybody has a clear conscience. We haven't submitted it yet. This will be the first time.

**JH:** Well I'm just afraid when they see it.

**TP:** They're not going to see it. That's the thing. They didn't even bother to look.

**JH:** I'm fine with that. I mean, I just…

**TP:** I am too. No, I have a perfectly clear conscience about it. We have given up more money on Vance that we were entitled to, not just on the wage adjustment.

**JH:** Yeah, I know. We've talked about it.

**TP:** So, let it go. I wish that I had not made that mistake but I'm perfectly happy with it. It comes down to the bargaining table.

**JH:** I'm just amazed that they didn't find it.

**TP:** I'm not. I'm not the least bit amazed, or surprised. But that's because I've been dealing with them for years.

**JH:** But as nit-picky as they have been in going through this with a fine-toothed comb.

**TP:** That would be Gunoy. You got to be specific. Gunoy is the only one that was trying to be nit-picky but she's not as smart as she thinks she is as is evidenced by the fact that she thought that we would have given up all the money for the Call-in not the Delta. The devil is in the details. She didn't want…she's not…I argued with her about so many things that she was just so off-base on. I thought "no wonder you're not an auditor anymore."

* * * * *

**TP:** I think I was talking about format but anyway….

**JH:** It always has been. Format has always been the same and that's how I found the error. Because I took the format but then I didn't pay attention to the formulas. And when I looked at how the formula should have been built rather than have four linked worksheets, I combined them all into one worksheet and then calculated how many longevity hours per year there were. Which, similar to what you had done.

**TP:** Yeah, the hours are good, it's just the fact that they maxed out. That's where the formula was a mistake.

**JH:** The test wasn't there to find out if they were…

**TP:** …are they at the max.

**JH:** At the max.

**TP:** I thought….but anyhow, go back and validate it.

**JH:** No, when we came back you said… what was it you said?

**TP:** Oh, I believe you.

**JH:** If we've got to…if we change this, then we may have to go back and change all of them.

**TP:** When we got back from negotiation?

**JH:** This was before we went to negotiation.

**TP:** Okay, yes, that would be true.

**JH:** And then, when we got back, I said okay. Because we thought they were going to talk about it…we thought it might come up at the negotiation.

**TP:** Yeah, I really did. I did. But they're not that smart. They're just not that smart.

**JH:** Well…

**TP:** And neither was I.

**JH:** Maybe they're just that tired. Sick and tired of the whole thing and they're wanting to close out the contract.

**TP:** It could be. It could be. But I've learned over the years, especially dealing with estimates and dealing with negotiation, if my conscience was not clear, I would have spoken up. It is.

**JH:** Okay.

**TP:** Yours may not be but it was my decision not yours so you can have a clear conscience. But yeah, we'll do it right from this point forward. There's no reason not to.

## IV. THE CLAIMS

133.   Once the AETC approved and accepted the negotiated prices for the fiscal year options 2010 through 2014, PAE submitted invoices to complete payment on the Vance Contract.  These invoices were all submitted during the period June through September 2014, by electronic means, by Stephanie Jeffers of PAE to the Defense Finance and Accounting Service ("DFAS") of the United States Department of Defense.  All these invoices included demands for payment that included amounts due to the overstated longevity wage-rate increases described above.

134.  Attached as Exhibit 9, is one such invoice. It was submitted by Stephanie Jeffers to DFAS on August 1, 2014, in the amount of $12,414,145.63; and was approved for payment on August 4, 2014.

135.  Contract Line Item Number ("CLIN") 604201 of this invoice was in the amount of $1,967,325.00, for the wage costs for the Vance Contract for the period October 1, 2013 through August 1, 2014.

136.  Of the amount in CLIM 604201, the amount of $804,992.50 comprised fraudulently overstated longevity wage-rate charges.

137.  Taken together, all invoices submitted by PAE to DFAS for the Vance Contract during the period June through September 2014 included fraudulently overstated longevity wage-rate charges totaling $3,753,247; and the United States paid these overstated charges to PAE.

## COUNT ONE

## (Fraudulent Claims: 31 U.S.C. § 3729(a)(1)(A))

138.  The Plaintiff realleges and reincorporate by reference the allegations contained in paragraphs one through one hundred thirty-six of this Complaint, and further alleges:

139.  By the manner and means described above, the Defendant PAE Applied Technologies LLC fraudulently induced the AETC to agree to a price for the Vance Contract, based upon the 2009 through 2014 proposals, for all options for years 2010 through 2014, which proposals included overstated charges for longevity wage-rates for services employees.

140.  During the period of about June through September 2014, the Defendant PAE knowingly and intentionally presented and caused to be presented to the United States Government false or fraudulent claims for payment or approval, these claims being all invoices

submitted by PAE for the Vance Contract to the Defense Finance Administrative Service, which included the overstated charges for longevity wage-rates for PAE's service employees for Option Years 2010 through 2014.

141.  Each presentation of the aforesaid claims by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(A).

142.  As a result of these false and fraudulent claims, the United States suffered actual damages.

## COUNT TWO

## (False Records and Statements: 31 U.S.C. § 3729(a)(1)(B))

143.  The Plaintiff realleges and reincorporates by reference the allegations contained in paragraphs one through one hundred and thirty-six, and one hundred thirty-eight through one hundred forty-one of this Complaint, and further alleges:

144.  By the manner and means described above, during the period 2012 through May 2014, the Defendant PAE Applied Technologies LLC knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims, as follows:

(a)    the false records being the above-described workbooks and spreadsheets that comprised the proposals submitted by PAE to the AETC in support of its proposals for fiscal years 2009 through 2013; and

(b)    the false statements being the above-described entries made by PAE in these workbooks and spreadsheets.

145.  The aforesaid workbooks, spreadsheets, and entries were material to the decision by AETC to agree to and approve the final price for the Vance Contract and its options for fiscal years 2009 through 2013, in that they had the capacity to influence, and did influence, the AETC

representatives who met with PAE's representatives, and who and otherwise examined and analyzed PAE's proposals for these years.

146.  The aforesaid workbooks, spreadsheets, and entries were further material to the decision by DFAS to pay the false and fraudulent invoices for the Vance Contract and its options for fiscal years 2009 through 2013 presented by PAE to DFAS, in that they had the capacity to influence, and did influence, the AETC to agree to and approve the final price for this contract and its options.

147.  Each such making or use of the aforesaid records and statements by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(B).

148.  As a result of the making and use of these false records and statements, the United States suffered actual damages.

## COUNT THREE

### (Reverse False Claim: 31 U.S.C. § 3729(a)(1)(G))

149.  The Plaintiff realleges and reincorporates by reference the allegations contained in paragraphs one through one hundred and thirty-six, and one hundred thirty-eight through one hundred forty-one of this Complaint, and further alleges:

150.  When preparing the PAE proposal for the Vance contract for the Fiscal Year 2014, James Hughes initially included three additional columns in the Excel spreadsheet for calculating the limits on longevity pay and for calculating the correct amount of longevity pay.

151.  Prior to presenting this proposal to the AETC, Terrie Paschall instructed James Hughes to remove the additional columns, so as to avoid identifying the fact that the prior proposals contained inflated amounts for longevity pay and thus overcharged the Government. On or about May 28, 2014, Terrie Paschall sent an email (Exhibit 10) to James Hughes regarding

this proposal instructing Mr. Hughes as follows: "Do not add more columns than in previous proposals for CBA longevity [calculations], just add criteria to the formula. Adding unnecessary columns only highlights differences."

152. PAE presented its proposal to AETC for the Vance contract for the Fiscal Year 2014, with the three additional columns having been removed, in or about late September or early October 2014, this being after all or most of the inflated invoices for the Vance contract for the 2009 through 2013 Fiscal Years had been submitted, and after all or most of these invoices had been paid by the Government.

153. At the time that PAE presented its proposal to AETC for the Vance contract for the Fiscal Year 2014, PAE had an obligation to refund to the Government those portions of those invoices that had already been paid that represented the overcharges for the inflated longevity pay included in the Fiscal Year 2010 through 2013 proposals.

154. By presenting its Fiscal Year 2014 proposal to AETC with the three additional columns having removed, PAE knowingly concealed, and knowingly improperly avoided and decreased its obligation to pay or transmit money to the Government that represented a return of the overcharges for the inflated longevity pay included in the Fiscal Year 2010 through 2013 proposals.

155. The concealment, and improper avoidance and decreasing of its obligations to pay or transmit money to the Government by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(G).

156. As a result of this concealment, and improper avoidance and decreasing of its obligations to pay or transmit money to the Government by the Defendant, the United States suffered actual damages.

## COUNT FOUR

## (False Claim: 31 U.S.C. § 3729(a)(1)(A))

157.  The Plaintiff realleges and reincorporates by reference the allegations contained in paragraphs one through one hundred and thirty-six, one hundred thirty-eight through one hundred forty-one, and one hundred forty-three through one hundred forty-seven of this Complaint, and further alleges:

158.  An "Award Fee," that is, a type of incentive for good or excellent performance, is included in a contract when:

> (i) The work to be performed is such that it is neither feasible nor effective to devise predetermined objective incentive targets applicable to cost, schedule, and technical performance;
>
> (ii) The likelihood of meeting acquisition objectives will be enhanced by using a contract that effectively motivates the contractor toward exceptional performance and provides the Government with the flexibility to evaluate both actual performance and the conditions under which it was achieved; and
>
> (iii) Any additional administrative effort and cost required to monitor and evaluate performance are justified . . . .

FAR § 16.401(e)(1).

159.  The amount of the Award Fee is determined pursuant to the follows criteria (emphasis added):

> The amount of award fee earned shall be commensurate with the contractor's overall *cost*, schedule, and technical performance as measured against contract requirements in accordance with the criteria stated in the award-fee plan. Award fee shall not be earned if the contractor's overall *cost*, schedule, and technical performance in the aggregate is below satisfactory. The basis for all award-fee determinations shall be documented in the contract file to include, at a minimum, a determination that overall *cost*, schedule and technical performance in the aggregate is or is not at a satisfactory level. This determination and the methodology for determining the award fee are unilateral decisions made solely at the discretion of the Government.

FAR § 16.401(e)(1).

160.  The Vance contract included a provision for an Award Fee.  As explained in the Attachment 12 to FA3002-08-C-0007-P00018, at 3 (underline in original):

> 1. Purpose: This award fee plan applies to service provider performance for Aircraft Maintenance, Airfield Management, Aircrew Life Support, and Base Operating Support (BOS) for the 71 FTW at Vance AFB, OK. The purpose of this plan is to define responsibilities and procedures for determining the award fee if a periodic award to the service provider is warranted. The purpose of the award fee is to motivate the service provider to optimum performance and to emphasize key areas of management concern. This plan provides organization, specific policy, and procedural guidance by which the contract performance is evaluated. The subjective assessment of government quality assurance personnel, functional commanders, and the Contract Award Fee Board members will be the basis upon which award fee may be awarded (earned) for each evaluation period.  <u>NOTE: Award fee is given for continuous process improvement resulting in performance above contract requirements (standards).</u>  Award fee will not be rolled over to the next period. Allocation of the award fee is the sole responsibility of the Fee Determining Official (FDO). The FDO award fee determination is final and is not subject to the "Disputes" clause of the contract.

161.  The process for determining the amount of the Award Fee for the Vance Contract included two evaluation sessions performed during the base period and during each option period.  The amount of award fee available during each evaluation session was 50% of an award fee pool made available for that fiscal year.

162.  The Award Fee for the Vance Contract was determined in part based upon cost control for contract performance.

163.  The award fee pool Fiscal Year 2009, comprised of two evaluation sessions, was $2,000,000.

164.  On or about December 17, 2014, Nellie Martin, Administrative Contracting Officer ("ACO"), completed a Contractor Performance Assessment for the Vance Contract (Exhibit 11). Material elements of this assessment included:

**TABLE H**
**(Contract Performance Evaluation)**

| Element | Rating | Comments by the ACO |
|---|---|---|
| Cost Control | Very Good | [C]urrent PAE estimates show PAE under target again. PAE voluntarily reduced their end of year invoice based on the project underrun. PAE's aggressive and successful cost control measures are noteworthy and justify rating Cost Control as Very Good. The Government looks forward to PAE's continued efforts to keep costs below ceiling price while striving to fulfill all parts of the contract to ensure mission success. |
| Management | Exceptional | [I]n FY14, there were several changes to the management team that has ensured the meeting of contract requirements. Personnel changes in relation to the PMEL LOG, as well as Deputy Program Manager personal oversight of the Fire Department and the addition of an auditor to address issues at the Fire Department demonstrated effective management, which allowed Vance to continue its mission. |
| Regulatory Compliance | Satisfactory | PAE complied with requirements . . . . |

165.  Based in material part on this evaluation, the Government paid to PAE a total Award fee of approximately $1,500,000, and not more than $2,000,000, for Fiscal Year 2014 for its performance on the Vance Contract.

166.  This evaluation was based in material part upon the proposals for Fiscal Years 2010 through 2014 as presented by PAE to the AETC, and negotiated and agreed-upon by PAE and the AETC, which proposals were false and fraudulent in that they contained inflated costs for longevity pay.  Had the ACO and the AETC known the truth, this being that the longevity pay amounts stated and represented in the proposals for the Vance Contract for the Fiscal Years 2009 through 2014 were false and inflated, then the ACO and the AETC would have determined that PAE's ratings for Cost Control, Management, and Regulatory Compliance for both evaluation sessions for Fiscal Year 2014 were "Unsatisfactory."

167. Had the ACO and the AETC determined that PAE's ratings for Cost Control, Management, or Regulatory Compliance were Unsatisfactory, the evaluation of PAE's performance in the aggregate would have been Unsatisfactory; and, pursuant to FAR § 16.401(e)(3)(v), they could not and would not have authorized any Award Fee to be paid to PAE for the 2014 Fiscal Year.

168. Had the ACO and the AETC known that the longevity pay stated in the proposals for the Vance Contract for the Fiscal Years 2009 through 2014 were knowingly false and inflated, then the ACO and the AETC would not have authorized any Award Fee to be paid to PAE for the 2014 Fiscal Year.

169. During the period of period February through May 2014, the Defendant PAE Applied Technologies LLC, fraudulently induced the DFAS to pay and approve false and fraudulent claims for the Award Fees for both evaluation sessions for Fiscal Year 2014 for the Vance Contract, by presenting false records and statements, these being (a) the above-described workbooks and spreadsheets that comprised the proposals submitted by PAE to the AETC in support of its proposals for fiscal years 2009 through 2013, and the above-described entries made by PAE in these workbooks and spreadsheets..

170. Each presentation of the aforesaid claims by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(A).

171. As a result of these false and fraudulent claims, the United States suffered actual damages.

## COUNT FIVE

### (False Claim: 31 U.S.C. § 3729(a)(1)(B))

172. The Plaintiff realleges and reincorporates by reference the allegations contained in paragraphs one through one hundred and thirty-six, one hundred thirty-eight through one hundred forty-one, one hundred forty-nine through one hundred fifty-five of this Complaint, and paragraphs one hundred fifty-six through one hundred seventy, and further alleges:

173. By the manner and means described above, during the period February through May 2014, the Defendant PAE Applied Technologies LLC knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims, as follows:

(a)   the false records being the above-described workbooks and spreadsheets that comprised the proposals submitted by PAE to the AETC in support of its proposals for fiscal years 2009 through 2013; and

(b)   the false statements being the above-described entries made by PAE in these workbooks and spreadsheets.

174. The aforesaid workbooks, spreadsheets, and entries were material to the decision by AETC to agree to and approve the Award Fee for the Vance Contract for the two evaluation sessions for Fiscal Year 2014, in that they had the capacity to influence, and did influence, the ACO who evaluated the performance of PAE for the Vance Contract.

175. Each such making or use of the aforesaid records and statements by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(B).

176. As a result of the making and use of these false records and statements, the United States suffered actual damages.

**REQUEST FOR RELIEF**

The Plaintiff, James John Hughes, acting on behalf of and in the name of the United States, hereby demands and seeks that judgment be entered in favor of the United States, and against the Defendant PAE Applied Technologies LLC, for each count as follows:

1. For treble damages incurred by the United States;

2. For civil penalties of eleven thousand dollars ($11,000) for each false claim submitted to the United States, in the form of the above invoices for the Vance Contract submitted electronically by PAE to DFAS during the period June through September 2014;

3. For civil penalties of eleven thousand dollars ($11,000) for each concealment, and improper avoidance and deceasing, of its obligations to pay or transmit money to the Government;

4. For civil penalties of eleven thousand dollars ($11,000) for payments made by the United States for an Award Fee that PAE fraudulently induced DFAS to make;

5. For civil penalties of eleven thousand dollars ($11,000) for each false record and statement made or used to get false claims paid or approved, in the form of the above-described workbooks, and spreadsheets that comprised or supported PAE's 2009 through 2014 Proposals for the Vance Contract and its options; and the above-described entries in those workbooks and spreadsheets pertaining to the costs for longevity wage-rate increases for PAE's service employees;

6. For interest on: the above treble damages, from the date on which the damages were incurred; and on the above civil penalties, from the date on which this Complaint is served upon the Defendant;

7. For all costs and expenses of this civil action; and

8.   For such other and further relief as the Court deems just and equitable.

In addition, the Plaintiff, James John Hughes, acting on his own behalf, demands and seeks that an award be made in his favor as follows:

1.   For twenty-five percent (25%) of the proceeds collected by the United States, if the United States proceeds with this action; or for thirty percent (30%) of such proceeds if the United States does not proceed with this action;

2.   For an amount for reasonable expenses necessarily incurred by James John Hughes in the prosecution of this action;

3.   For all reasonable expenses incurred by James John Hughes in relation to these proceedings, plus all reasonable attorney's fees and costs; and

4.   For such other and further relief to which James John Hughes may show himself justly entitled.

The Plaintiff hereby demands that this matter be tried before a jury.

By:   *Andrew Grosso*
Andrew Grosso, Esq. (DC Bar No. 358326)
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 300
Washington, D.C. 20007
(202) 298-6500 Tel.
Agrosso@acm.org
www.GrossoLaw.com

Attorney for Relator James John Hughes

Dated: June 1, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2017, I filed the foregoing by First Class U.S. Mail upon

the following:

Ron Gallegos, AUSA
U.S. Attorney's Office
Western District of Oklahoma
210 West Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102

Andrew Grosso, Esq.
ANDREW GROSSO & ASSOCIATES